967 So.2d 1078 (2007)
Doreen OUELLETTE, as Personal Representative of the Estate of Lewellyn Ouellette, deceased, Appellant,
v.
Bhasker J. PATEL, M.D., Appellee.
No. 2D06-3397.
District Court of Appeal of Florida, Second District.
November 9, 2007.
*1079 Jawdet I. Rubaii and Jack F. White, III, of Jawdet I. Rubaii, P.A., Clearwater, for Appellant.
Mindy McLaughlin, Judith W. Simmons, and Gabrielle S. Osborne of Burton, Schulte, Weekley, McLaughlin & Beytin, P.A., Tampa, for Appellee.
WALLACE, Judge.
Doreen Ouellette, as Personal Representative of the Estate of Lewellyn Ouellette, deceased, appeals a final summary judgment that terminated her medical malpractice action against Bhasker J. Patel, M.D. Because the circuit court erroneously failed to consider the expert witness affidavit that Mrs. Ouellette filed in opposition to Dr. Patel's motion for summary judgment, we reverse the summary final judgment and remand for further proceedings.

The Facts
On April 25, 1997, Dr. Patel, a cardiologist, admitted Mr. Lewellyn Ouellette to a hospital in New Port Richey for a percutaneous transluminal angioplasty (balloon angioplasty) of his right superficial femoral artery. After the procedure was completed, Mr. Ouellette developed an occlusion of the blood flow in the artery. Such an occlusion is a known complication of the procedure that is generally treated by surgery. After deciding that Mr. Ouellette required surgical intervention to restore blood flow in the leg, Dr. Patel contacted Raymond Waters, M.D., a vascular surgeon, for assistance. However, Dr. Waters was performing emergency surgery at another hospital and was unavailable. Dr. Patel's efforts to find another local surgeon to treat Mr. Ouellette were unsuccessful. Accordingly, Dr. Patel made arrangements for Mr. Ouellette to be transported to Tampa General Hospital (TGH) by helicopter. At TGH, another surgeon operated on Mr. Ouellette to correct the occlusion of the blood flow in his right leg. Several months later, Mr. Ouellette underwent an amputation of his right leg below the knee.

The Proceedings in the Circuit Court
In 1999, Mr. Ouellette filed a medical malpractice action against Dr. Patel, another doctor, and the hospital where Dr. Patel had performed the balloon angioplasty. In his complaint, Mr. Ouellette *1080 demanded a jury trial. The theory of Mr. Ouellette's claim against Dr. Patel was that Dr. Patel was responsible for the delay in obtaining the surgical treatment that was necessary to restore blood flow to Mr. Ouellette's right leg. Mr. Ouellette contended that the delay in obtaining surgical intervention stemming from Dr. Patel's alleged omissions ultimately led to the amputation of Mr. Ouellette's right leg. Mr. Ouellette died in January 2005, and Mrs. Ouellette, in her capacity as the personal representative of her late husband's estate, was substituted as the party plaintiff.
The plaintiff's medical expert was Gabor Kovacs, M.D. In March 2004, Dr. Patel took Dr. Kovacs' deposition. In his deposition, Dr. Kovacs offered his opinion concerning Dr. Patel's alleged breach of the prevailing professional standard of care:
Q. [by Dr. Patel's attorney] Moving forward on what Dr. Patel did appropriate[ly], obviously you believe stenting of the iliac was indicated, and that the angioplasty that he performed on [Mr. Ouellette's] right leg was also indicated.
A. Yes, it was indicated.
Q. Let's move on.
Obviously, we know what occurred in this particular case is a known risk and complication of angioplasty; correct?
A. It's a recognized risk.
Q. And as such, obviously, you're not critical of Dr. Patel for the technique in the surgery. Your criticisms begin after the complication first arose; correct?
A. Yes.
Q. Why don't you now tell me what it is, if anything, you believe Dr. Patel could have or should have done differently[?]
A. Well, Dr. Patel did the angioplasty; and when you do a procedure, to begin with . . . either you should be able to . . . handle [by yourself] the complications that you may be causing, or you should have some contingency plan, or some way of extricating yourself from a complication when it does[]when it did occur.
Q. Now, let me interrupt you real quick. Is it your understanding that Dr. Patel did not have a backup plan to extricate himself in the event that he ran into trouble in [the] angioplasty?
A. That's the impression that I got from the records.
Q. Now, let me ask it to you this way. If you assume for me hypothetically, I understand you don't have impressions from the records in front of you, but if I understand your criticism correctly, if you assume for me hypothetically that Dr. Patel actually did have a surgeon on backup that was qualified and able to extricate him from any difficulties that arose from any known or accepted complication, then obviously that criticism would go away; correct?
A. Yes.
Q. What other criticisms do you have?
A. Well, that's the basic criticism[,] the fact that he undertook to do a procedure which I guess it's a matter of debate whether cardiologist[s] or even interventional radiologist[s] should be doing procedures that they cannot handle the complications of, but then having undertaken it, he had no way of helping the patient once the complication occurred.
Thus Dr. Kovacs' deposition testimony on the issue of the standard of care focused on the question of Dr. Patel's arrangements for surgical backup, not on his performance of the procedure itself.
In January 2006, Dr. Patel filed a motion for summary judgment. In his motion, Dr. Patel contended that Mrs. Ouellette could not establish a breach of the standard of care because "[t]he undisputed evidence in this case is that Dr. Patel did, *1081 in fact[,] have surgical back up for this procedure. . . . Therefore, Plaintiff's expert conceded that Dr. Patel would have met the standard of care." In support of his motion, Dr. Patel relied in part on the deposition testimony of Dr. Waters, the surgeon who was unavailable when Dr. Patel called him for assistance following Mr. Ouellette's balloon angioplasty.
In his deposition, Dr. Waters testified that in 1997 he regularly served as the surgical backup for cardiologists such as Dr. Patel who were performing balloon angioplasty procedures. However, according to Dr. Waters, the prevailing standard of care for such cardiologists did not require that they have a backup surgeon immediately available while the procedure was being performed. Dr. Waters recalled that Dr. Patel had informed him about his plan to perform a balloon angioplasty on Mr. Ouellette. Sometime between April 16 and April 25, the day of the procedure, Dr. Waters had agreed with Dr. Patel that "absent some emergency, [he] would be available as a surgical backup." On the day of the procedure, Dr. Waters was called to perform emergency surgery on a patient at another hospital. Thus, when Dr. Patel called Dr. Waters for assistance with Mr. Ouellette, Dr. Waters was unable to respond because he was already operating on another patient. Dr. Waters recalled thaton the day of the procedure, before Dr. Patel had called him to perform emergency surgery on Mr. Ouelletteneither Dr. Patel nor anyone from his staff had checked to see if Dr. Waters was, in fact, available.
Dr. Patel also relied on an affidavit from his expert witness, Marc A. Levine, M.D. In his affidavit, Dr. Levine opined that Dr. Patel's treatment of Mr. Ouellette was "within the acceptable standard of care." Dr. Levine explained further:
[I]n the United States in 1997, the standard of care for performance of peripheral vascular transluminal angioplasty by specialists other than Vascular Surgeons did not require that a Vascular Surgeon be on call/immediately available for evaluation and management of any complications such as acute, critical limb ischemia because they were so infrequent.
Thus Dr. Levine's opinion was that the applicable standard of care did not even require Dr. Patel to have made arrangements for surgical backup before beginning the balloon angioplasty on Mr. Ouellette's right leg.
In response to Dr. Patel's motion for summary judgment, Mrs. Ouellette filed an affidavit from Dr. Kovacs. In his affidavit, Dr. Kovacs responded in detail to the deposition testimony of Dr. Waters and the affidavit from Dr. Levine with regard to the applicable standard of care:
12. Nothing in the affidavit of Marc Levine, M.D.[,] or the deposition of Raymond Waters, M.D.[,] changes my opinion or the validity of my conclusions of negligence on the part of Dr. Patel. The deposition of Dr. Waters makes it very clear that Dr. Patel failed to meet the standard of care in having a surgical backup in place for the angioplasty procedure. In this particular case, it appears that Dr. Patel simply failed to contact the doctor responsible for the surgical backup (Dr. Waters) prior to beginning the procedure. Dr. Waters testified that he was called away for an emergency at another facility. However, it is clear that Dr. Patel never spoke to Dr. Waters prior to beginning the procedure to make sure that Dr. Waters was in place as the surgical backup. Dr. Waters confirmed this on page 21 of his deposition. . . .
13. It was Dr. Patel's responsibility to make sure that the surgical backup was in place at the time of the procedure. *1082 Dr. Waters' deposition shows that Dr. Patel did not check with Dr. Waters' office to make sure that he was at the facility prior to starting the procedure, and it was only after the procedure had failed that Dr. Patel contacted Dr. Waters and discovered that Dr. Waters was not in place to do the surgical backup. This resulted in a considerable delay and complications to Mr. Ouellette.
. . . .
16. In plain fact, Dr. Patel did not have a surgical backup and took no steps on the day of the procedure to ensure one was in place. Dr. Waters clearly testifies that he discussed the possibility of an emergency with Dr. Patel that would make him unavailable. . . . Furthermore, it is clear that Dr. Patel undertook and bore the responsibility for insuring the presence of a competent surgical backup. In other words, the fact that Dr. Patel wrongly believed he had a surgical backup when he did not does not render him any less negligent. Indeed, Dr. Patel's belief was apparently the result of his own negligence.
17. In my opinion, the medical care rendered to Mr. Ouellette by Dr. Bhasker J. Patel failed to meet the accepted standard of medical care. Dr. Patel should have had a vascular surgical team ready as backup in case a mishap should occur.
Mrs. Ouellette timely served a copy of Dr. Kovacs' affidavit on opposing counsel before the hearing on the motion for summary judgment. See Fla. R. Civ. P. 1.510(c).
At the hearing on the motion for summary judgment, Dr. Patel emphasized Dr. Kovacs' deposition response to a hypothetical question. When asked to assume that "Dr. Patel actually did have a surgeon on backup that was qualified and able to extricate him from any difficulties that arose from any known or accepted complication," Dr. Kovacs had agreed that his criticism of Dr. Patel "would go away." However, Dr. Kovacs' acknowledgment that his criticism of Dr. Patel "would go away" under these circumstances was necessarily indefinite because the hypothetical question itself did not define what the questioner meant by having "a surgeon on backup." Furthermore, Dr. Patel did not ask any additional questions to establish what Dr. Kovacs understood having "a surgeon on backup" would require.
Based on Dr. Kovacs' response to the ambiguous hypothetical question, Dr. Patel argued that his arrangements with Dr. Waters for surgical backup "absent some emergency" demonstrated conclusively that he had met the standard of care as testified to by Dr. Kovacs in his deposition. Dr. Patel urged the circuit court to strike Dr. Kovacs' affidavit because it contradicted his prior deposition testimony concerning the applicable standard of care. After hearing argument, the circuit court agreed that Dr. Kovacs' affidavit contradicted his deposition testimony concerning the standard of care. The circuit court struck the affidavit as contradictory and ruled that Dr. Patel was entitled to summary judgment "on that ground and that ground alone." Mrs. Ouellette moved for rehearing, but the circuit court denied her motion. This appeal followed.

The Applicable Law
A party may not file his or her own affidavit, or that of another, baldly repudiating his or her own deposition testimony to avoid the entry of a summary judgment. See Ellison v. Anderson, 74 So.2d 680, 681 (Fla.1954); Briguera v. Behr Paint Corp., 712 So.2d 824, 826 (Fla. 2d DCA 1998) (citing Stanford v. CSX Transp., Inc., 637 So.2d 37, 38 (Fla. 2d DCA 1994)). Nonetheless, "[a] party may file a subsequent affidavit for the purpose of explaining testimony given at a prior *1083 deposition, provided the explanation is credible and not inconsistent with the previous sworn testimony, even though it creates a jury issue on the opponent's motion for summary judgment." Jordan v. State Farm Ins. Co., 515 So.2d 1317, 1319 (Fla. 2d DCA 1987) (citing Willage v. Law Offices of Wallace & Breslow, P.A., 415 So.2d 767 (Fla. 3d DCA 1982)). The principle that a party defending a motion for summary judgment is entitled to all reasonable inferences in his or her favor "includes giving to the previous deposition any reasonable meaning which will not conflict with the subsequently filed affidavit." Koflen v. Great Atl. & Pac. Tea Co., 177 So.2d 529, 531 (Fla. 3d DCA 1965).

Discussion
In this case, Dr. Kovacs' deposition testimony was that Dr. Patel's performance fell below the prevailing professional standard of care because he did not have "a surgeon on backup to allow him to be extricated from any type of danger situation should a complication occur." In his motion for summary judgment, Dr. Patel argued that his performance met the standard of care because prior to the day of Mr. Ouellette's balloon angioplasty, Dr. Waters had agreed to be available to provide surgical backup, absent some other emergency. However, as it happened, another emergency did arise, and Dr. Waters was not available to treat Mr. Ouellette. Because no other surgeons were available locally, Dr. Patel had to arrange for Mr. Ouellette to be flown by helicopter to TGH where he was treated by another surgeon. Without question, an emergency helicopter flight from New Port Richey to Tampa and surgery at TGH were not part of Dr. Patel's surgical backup plan for Mr. Ouellette.
In his affidavit, Dr. Kovacs addressed Dr. Patel's contention that his prior arrangements with Dr. Waters for surgical backup met the standard of care. Dr. Kovacs opined that Dr. Patel's performance failed to meet the standard of care because Dr. Patel had never contacted Dr. Waters before beginning the balloon angioplasty to confirm that he was in fact available. According to Dr. Kovacs, Dr. Patel's erroneous belief that "he had a surgical backup when he did not does not render him any less negligent." No one had asked Dr. Kovacs at his deposition whether an unconfirmed arrangement for surgical backup with a surgeon who might or might not be availabledepending on the occurrence of another emergencymet the prevailing professional standard of care. Thus the views expressed by Dr. Kovacs in his affidavit were not inconsistent with his prior deposition testimony. Instead, they merely explained and elaborated on the deposition testimony in light of additional facts. Thus Dr. Kovacs' affidavit did not "baldly repudiate" his prior deposition testimony.

Conclusion
For these reasons, the circuit court erred in striking and refusing to consider Dr. Kovacs' affidavit. See Ellison, 74 So.2d at 681; Briguera, 712 So.2d at 825-26; Stanford v. CSX Transp., Inc., 637 So.2d 37, 38 (Fla. 2d DCA 1994); Lawrence v. Pep Boys-Manny Moe & Jack, Inc., 842 So.2d 303, 305-06 (Fla.5th DCA 2003); Cosman v. Bea Morley Real Estate Group, 820 So.2d 1040, 1042-43 (Fla. 4th DCA 2002). Due consideration of Dr. Kovacs' affidavit would have disclosed that it raised an issue of fact concerning what the prevailing professional standard of care required of Dr. Patel with respect to arrangements for surgical backup before beginning the balloon angioplasty procedure on Mr. Ouellette. See Torres v. Sullivan, 903 So.2d 1064, 1067-68 (Fla. 2d DCA 2005). This issue of fact was to be resolved by a jury, not by the trial judge on a motion for summary judgment. See id. at 1068. Thus the circuit court erred in *1084 granting Dr. Patel's motion for summary judgment. Accordingly, we reverse the summary final judgment, and we remand this case to the circuit court for further proceedings.
Reversed and remanded for further proceedings.
WHATLEY, J., and THREADGILL, EDWARD F., Senior Judge, Concur.