983 So.2d 648 (2008)
Ronald KLING and Mary Jane Kling, Appellant,
v.
Antonio DiSCLAFANI, M.D., et al., Appellee.
No. 5D07-2019.
District Court of Appeal of Florida, Fifth District.
May 16, 2008.
Rehearing Denied June 11, 2008.
*649 Harvey J. Sepler, of Harvey J. Sepler, P.A., Hollywood, for Appellant.
Shelley H. Leinicke, of Wicker, Smith, O'Hara, McCoy & Ford, P.A., Fort Lauderdale, for Appellee.
GRIFFIN, J.
Ronald and Mary Jane Kling ["Plaintiffs"] appeal the order entering summary final judgment in favor of Antonio DiSclafani, M.D. and Ocala Neurosurgical Center, Inc. ["Defendants"] in a medical malpractice case. Because the trial court erred in concluding there was no evidence of Dr. DiSclafani's negligence, we reverse.
Dr. DiSclafani and Dr. Barry J. Kaplan both worked for the Ocala Neurosurgical Center, Inc. On April 5, 2000, Dr. Kaplan performed a laminectomy and microdiskectomy on Mr. Kling's back at the Ocala Regional Medical Center. Following surgery, Dr. DiSclafani, a neurosurgery specialist, took over for Dr. Kaplan in caring for Mr. Kling. Dr. DiSclafani first saw Mr. Kling at about 8 a.m. on April 7, 2000. That same day, Mr. Kling's catheter was removed, and it was discovered that he was having trouble urinating. Dr. Edward King, a urology specialist, examined Mr. Kling. Dr. King apparently concluded that Mr. Kling's urinary problems resulted from a preexisting condition and were not the result of a neurological problem.
Dr. DiSclafani saw Mr. Kling again on the morning of April 8, 2000. He was apparently aware of Dr. King's opinion and felt that no further work up was warranted at that time. Later that day, around noon, Dr. DiSclafani was notified that Mr. Kling had weakness in his legs and burning in his buttocks, and he ordered an MRI. The MRI revealed that a hematoma or blood clot had developed somewhere in the junction of Mr. Kling's thoracic and lumbar spine and was causing compression on his spinal cord  a condition known as cauda equina syndrome. So, at about 7 p.m. that same day, Dr. DiSclafani took Mr. Kling back into the operating room on an emergent basis and evacuated the blood clot to alleviate the compression on his spinal cord.
On February 28, 2003, Plaintiffs filed this lawsuit against Defendants.[1] In *650 Count III of their Second Amended Complaint, Plaintiffs alleged that Dr. DiSclafani had a duty of reasonable care in his diagnosis, care and treatment of Mr. Kling;[2] that Dr. DiSclafani's conduct departed from the applicable professional standard of care; and that, as a result, Mr. Kling was injured.[3]
On September 20, 2004, Defendants deposed Plaintiffs' expert Dr. Lawrence B. Schlachter. Dr. Schlachter's testimony addressed the applicable standard of care and whether Dr. DiSclafani's conduct met that standard. After Dr. Schlachter's deposition, Defendants filed a motion for summary judgment, contending that Dr. DiSclafani's conduct indisputably met the standard of care that Dr. Schlachter articulated in his deposition testimony. The defense theory was that Dr. Schlachter testified in his deposition that the applicable standard of care would have been met if Dr. DiSclafani had operated on the cauda equina sometime between April 7 and April 8, 2000. Because Dr. DiSclafani did actually operate on April 8, 2000, Defendants reasoned that Dr. DiSclafani was "within the standard of care under Plaintiff's own neurosurgical expert witness."
In response, Plaintiffs filed an affidavit from Dr. Schlachter, purporting to clarify statements that Dr. Schlachter made in his deposition on which Defendant was basing the summary judgment motion. The trial court heard arguments on Defendants' motion on May 31, 2006, and denied Defendants' motion for summary judgment without prejudice.
Defendants subsequently filed a motion to strike and suppress Dr. Schlachter's affidavit. The motion asserted that the affidavit had "boldly" stated an opinion entirely different than that contained in Dr. Schlachter's deposition, solely for the purpose of blocking summary judgment. Further, the motion argued that Plaintiffs failed to correct any errors in Dr. Schlachter's deposition in accordance with the Rules of Civil Procedure and that they should not be allowed to correct such errors at this point through Dr. Schlachter's affidavit.
In response, Plaintiffs denied that Dr. Schlachter's deposition testimony exonerated Dr. DiSclafani of negligence. Rather, Dr. Schlachter's testimony established that *651 Dr. DiSclafani failed to diagnose Mr. Kling's condition in a timely manner and that the delay in diagnosis and consequent treatment damaged Mr. Kling. Also, they said that it steadfastly had been their position that Defendants' Motion for Summary Judgment was based on Defense counsel's erroneous perception of Dr. Schlachter's testimony, and, therefore, the filing of an errata sheet to the deposition would have been inappropriate. Plaintiffs accordingly asserted that the affidavit, which clarified Dr. Schlachter's deposition testimony, was proper. They argued that the trial court should deny Defendants' motions to strike and suppress Dr. Schlachter's statements and the motion for summary judgment. After a hearing, the trial court filed orders granting Defendants' motions to strike Dr. Schlachter's affidavit, granting Defendant's renewed motion for summary judgment and entering summary final judgment in Defendants' favor.
At issue is whether there is any evidence in the record to establish that Dr. DiSclafani's treatment of Mr. Kling fell below the standard of care appropriate for a neurosurgeon. In his deposition, Dr. Schlachter, a neurosurgeon, testified that the standard of care in treating cauda equina syndrome is surgical intervention as quickly as possible. Dr. Schlachter explained that the standard of care issue is separate from the issue of how long it may be possible to delay treatment without harming the patient. The deposition reflects the following exchange between defense counsel and Dr. Schlachter:
Q. (By Mr. O'Hara) From the standpoint of the time frame of intervention in a cauda equina syndrome, what is the range that is given in the literature that you have reviewed in number of days or hours?
A. Well, I'll start off by telling you that everything I have read says that early surgery is the standard of care. Everything I have read has said that one should operate as early as is possible to make the diagnosis to get the best result.

The literature then discusses other issues, which you are alluding to in your question which is how long can one wait and at what point does the waiting become harmful to the patient as opposed to not harming the patient. In other words, so what? It didn't hurt.
And these two points that I raise are really very different points. There is essentially no excuse for not diagnosing the syndrome, and there is no excuse for not operating early, period.
(emphasis added).
Dr. Schlachter then explained that Dr. DiSclafani fell below the standard of care in failing to properly examine and diagnose Mr. Kling on April 7th. Specifically, with respect to Dr. DiSclafani's examination of Mr. Kling, he said that it did not appear that Dr. DiSclafani conducted the "appropriate level of investigation" on the morning of April 7th to determine whether the inability to urinate was due to cauda equina syndrome. In his opinion, "a more detailed examination, including a sensory examination and a rectal examination, would be the standard of care at this time at 8:00 in the morning on 4/7/00 to rule out or to confirm that there were other neurological components to this inability to urinate." In his view, there was a reasonably good likelihood that Mr. Kling had diagnosable cauda equina syndrome on April 6, 2000. As time went on between the 6th and the 8th, the symptoms of the conditions became more obvious.
With respect to Dr. DiSclafani's diagnosis of Mr. Kling, Dr. Schlachter said:
My understanding is that Dr. DiSclafani assumed care of this patient on 4/7/00. It's my opinion that at the point in time *652 that he assumed the care of Mr. Kling that Mr. Kling was already suffering from a full-blown cauda equina syndrome[4] as of the morning of the 7th and very possibly even before that point in time and that the delay in diagnosing this problem over the subsequent two days fell below the standard of care in that he had numerous opportunities to make the diagnosis had he done an appropriate physical examination or paid attention to reports in the hospital record.
(emphasis added).[5]
Dr. Schlachter was not critical of Dr. DiSclafani for ordering the MRI or of the surgery he ultimately performed. In his opinion, however, both should have been done sooner. He explained:
Q. When is it your opinion that you feel Mr. Kling should have been operated on and still maintain the standard of care?
A. Well, it appears to me that on the morning of 4/7 Mr. King [sic] had cauda equine syndrome, and it appears that if he had been appropriately investigated at that point, a cauda equina syndrome would have been discovered.
The following exchange then occurred, which is the testimony on which Dr. DiSclafani relies:
Q. In your opinion, then, when is the window of opportunity to operate?
A. Window of opportunity to operate, although it's hazy and vague as to when it begins, it's clearly open on the morning of the 7th and the whole day of the 8th; and one could make a case that it was possible, you know, during the 6th also, but it's not as substantial.
Q. By window of opportunity, that's the opportunity to intervene with an operation and get a good outcome, even though the patient has cauda equina syndrome?
A. Well, this is where the controversy takes hold, which is everyone contends, everyone says that it's best to operate earlier and you get a better result. Does it mean that if you were to operate a bit later that you might not get some improvement? No. In other words, the door doesn't shut closed on the possible recovery because you've waited another day or so, but the potential for a better recovery is better earlier.
Q. All right. Standard of care in this case, in your opinion, the window of opportunity in which to operate and still be within the standard of care, although it's hazy and vague as to when it begins, would be by the morning of the 7th and the whole day of the 8th?
A. That's what I'm saying to you. And it's the fact that enough  there were enough symptoms and clues present to have done a more thorough investigation on the morning of the 7th than was done.
Q. All right. In order for Dr. DiSclafani to have complied with the standard of care, he needed to make his diagnosis *653 and operate in that window of opportunity?
A. I think that would have been appropriate for him.
Q. All right. When is the window of opportunity definitely closed, in your opinion?
A. I'm not sure it ever definitely closes. I think that the potential for recovery just reduces itself as time goes on.
Q. When is he no longer going to have chance (sic) of a good recovery, in your opinion?
. . . .
[A.] It's my opinion that the earlier the surgery is done, the better the chances of recovery, and most of the studies show that within 48 hours there is still a chance of a recovery. Beyond that, I would assume that the chances of recovery diminish even more rapidly.
The study of Kebaish talks about those who undergo exploration and evacuation within six hours of symptoms experience the greatest neurological recovery.
Q. (By Mr. O'Hara) I know that's what the articles say, but is it your opinion that within 48 hours of onset there is a good chance of recovery?
A. Of some level of recovery.
In discussing the two-day window, he later specifically noted that "[t]here is no question that in this case earlier would have been better in terms of his degree of improvement."
After receiving the defense's motion for summary judgment based on the foregoing testimony, Plaintiffs filed an affidavit from Dr. Schlachter to clarify his deposition testimony. In relevant part, this affidavit states:
3. It is my opinion based on a reasonable degree of medical probability that the Defendant, Dr. Sclafani (sic), deviated from the standard of care by failing to timely diagnose Mr. King's (sic) cauda equina syndrome and timely diagnose that the Plaintiff's cause of the cauda equina was a postoperative hematoma. By the time Dr. DiSclafani evacuated the hematoma on April 8, 2000, at approximately 7:00 p.m., it was too late to reverse the cauda equina syndrome.
As a result of the Defendant, Dr. DiSclafani's deviation from the standard of care, the Plaintiff, Ronald Kling, has permanent sequellae of his cauda equina syndrome which includes incontinence and impotence.
4. The excerpt from my deposition that the Defendant DiSclafani is relying upon his (sic) Motion for Summary Judgment is taken out of context. If my deposition is read in its totality, my opinions would be consistent with those stated in Paragraph (3) of this affidavit.
We conclude that, even without the clarifying affidavit, Dr. Schlachter's deposition testimony created an issue for the jury on Dr. DiSclafani's breach of the standard of care. We also see no basis to strike the affidavit because it does not conflict with Dr. Schlachter's deposition testimony. Certainly, if the affidavit were part of the record, the error in entering summary judgment for Dr. DiSclafani would be manifest.
Dr. Schlachter's deposition testimony was that Dr. DiSclafani's failure to diagnose cauda equina syndrome sooner than he did was contrary to the standard of care, which is to diagnose and treat as soon as it is possible, given the indications present. The defense position essentially comes down to one answer given in response to a single question in the entire deposition:
Q. All right. In order for Dr. DiSclafani to have complied with the standard *654 of care, he needed to make his diagnosis and operate in that window of opportunity?
A. I think that would have been appropriate for him.
Even this exchange, if examined closely, says that in order to comply with the standard of care, it would have been appropriate for him to make the diagnosis and operate within the window of opportunity. This does not mean that failure to make the diagnosis as promptly as possible would not breach the standard of care so long as it was within the "window of opportunity." Dr. Schlachter's testimony consistently was that the timely diagnosis breach meant that the operation was delayed and that the likelihood of its success diminished. His testimony was that there was no reason in the records he reviewed to justify the untimely diagnosis and the consequent delayed surgery, which established the breach of duty.
The "window of opportunity" for surgery does not negate that testimony. Notably, Dr. Schlachter never accepted defense counsel's proposed definition of the "window of opportunity." His testimony was unequivocal that although some recovery can be expected within forty-eight hours, the question and likelihood of recovery were constantly declining values as the hours passed. The defense's position that Dr. Schlachter said that Dr. DiSclafani complied with the standard of care because he made the diagnosis and performed surgery within forty-eight hours is simply an overreading of Dr. Schlachter's answers and it ignores the balance of the testimony. Here, the defense did not succeed in securing an admission by the plaintiff's expert that Dr. DiSclafani was not negligent, i.e. that his diagnosis and treatment fell within the standard of care.
As for the affidavit, the controlling legal principle is not in dispute. [A] party to a lawsuit will not be allowed to repudiate his or her prior deposition testimony by an affidavit executed by that party or by another person, in order to avoid a summary judgment. Arnold v. Dollar Gen. Corp., 632 So.2d 1144, 1145 (Fla. 5th DCA 1994); see also Ellison v. Anderson, 74 So.2d 680, 681 (Fla.1954)([A] party when met by a Motion for Summary Judgment should not be permitted by his own affidavit, or by that of another, to baldly repudiate his previous deposition so as to create a jury issue, especially when no attempt is made to excuse or explain the discrepancy.); Ouellette v. Patel, 967 So.2d 1078, 1082 (Fla. 2d DCA 2007). A party may, however, file a subsequent affidavit for the purpose of explaining testimony given at a prior deposition, provided the explanation is credible and not inconsistent with the previous sworn testimony, even though it creates a jury issue on the opponent's motion for summary judgment. Jordan v. State Farm Ins. Co., 515 So.2d 1317, 1319 (Fla. 2d DCA 1987); Ouellette, 967 So.2d at 1082-83. The principle that a party defending a motion for summary judgment is entitled to all reasonable inferences in his or her favor includes giving to the previous deposition any reasonable meaning which will not conflict with the subsequently filed affidavit. Ouellette, 967 So.2d at 1083 (quoting Koflen v. Great Atl. & Pac. Tea Co., 177 So.2d 529, 531 (Fla. 3d DCA 1965)).
Defendants claim that Plaintiffs' "own neurosurgical expert unequivocally testified in deposition that surgery by Dr. DiSclafani at any time on April 7 or April 8 met the standard of care and constituted good medical practice." Defendants then say, in accordance with Dr. Schlachter's deposition testimony, Dr. DiSclafani acted appropriately, because he performed the surgery on Mr. Kling at 7 p.m. on April 8. They assert that Dr. Schlachter's affidavit "was an impermissible attempt to change *655 his testimony for the sole purpose of defeating the summary judgment motion and could not be considered for this purpose." Finally, Defendants argue that, "[b]ecause the unrefuted testimony established that Dr. DiSclafani met the standard of care in properly and timely performing surgery within the optimum `window of opportunity,' the trial court properly granted summary final judgment in" Defendants favor.
It appears to us that Dr. Schlachter's deposition testimony and affidavit testimony are consistent.[6] It was only after defense counsel conflated the issue of the standard of care with his "window of opportunity" metaphor in his questioning that Dr. Schlachter made the statement that the defense relies on. At most, in light of the entire deposition testimony, Dr. Schlachter's answer amounts to no more than an ambiguous response to confusing questions that ignored Dr. Schlachter's already expressed opinions concerning the standard of care. A clarifying affidavit was appropriate.
REVERSED and REMANDED.
MONACO and LAWSON, JJ., concur.
NOTES
[1] This case was initially instituted against not only Defendants, but also Dr. Kaplan, Dr. King, and the Ocala Regional Medical Center. Early on, Plaintiffs dropped Dr. Kaplan from the suit. Then, pursuant to a settlement, the case against the Ocala Regional Medical Center was dismissed on December 8, 2004. On May 31, 2006, the trial court entered final summary judgment in favor of Dr. King.
[2] Specifically, Plaintiffs claimed:

16. Notwithstanding said duty, [Dr. DiSclafani] did or failed to do one or more of the following acts and any or all of which were a departure from the professional standard of care in Marion County, Florida, or any other similar community, to wit:
A. Failure to recognize Mr. Kling's condition was worsening;
B. Failure to order appropriate diagnostic studies;
C. Failure to consider that Mr. Kling's overflow incontinence was secondary to a neurogenic bladder;
D. Failure to perform and document a complete and thorough evaluation of Mr. Kling including but not limited to a neurological evaluation;
E. Failure to follow the progress of [Mr. Kling];
F. Failure to timely diagnose Mr. Kling's cauda equina condition;
G. Failure to timely treat Mr. Klings cauda equina condition;
H. Failure to render appropriate medical care to Mr. Kling.
[3] According to Plaintiffs' Second Amended Complaint, following the surgery, Mr. Kling was "left with permanent injuries including but not limited to chronic pain, suffering, incontinence and impotence."
[4] Dr. Schlachter explained that by "full-blown," he meant that the amount and degree of symptoms that were present at that time were sufficient for one to have made a diagnosis of cauda equina syndrome.
[5] In support of his position that Mr. Kling had full-blown cauda equina syndrome on the morning of April 7th, Dr. Schlachter noted that Mr. Kling was being catheterized intermittently and was not urinating on his own that day. Additionally, he was seen by a physical therapist on the morning of April 7th who wrote: "Patient complains of increasing pain and burning in buttocks running down both legs to the feet; declined, secondary to urinary incontinence and pain." Further, a bladder scan showed "an extremely large residual of urine in the bladder."
[6] In his affidavit, Dr. Schlachter said:

3. It is my opinion based on a reasonable degree of medical probability that the Defendant, Dr. Sclafani (sic), deviated from the standard of care by failing to timely diagnose Mr. King's (sic) cauda equina syndrome and timely diagnose that the Plaintiff's cause of the cauda equina was a postoperative hematoma. By the time Dr. DiSclafani evacuated the hematoma on April 8, 2000, at approximately 7:00 p.m., it was too late to reverse the cauda equina syndrome.
As a result of the Defendant, Dr. DiSclafani's deviation from the standard of care, the Plaintiff, Ronald Kling, has permanent sequellae of his cauda equina syndrome which includes incontinence and impotence.
Consistently, in his deposition, Dr. Schlachter said that it was his "opinion that at the point in time that [Dr. DiSclafani] assumed the care of Mr. Kling that Mr. Kling was already suffering from a full-blown cauda equina syndrome as of the morning of the 7th and very possibly even before that point in time and that the delay in diagnosing this problem over the subsequent two days fell below the standard of care. . . ." (emphasis added). Later, he added that "[t]here is no question that in this case earlier" surgery "would have been better in terms of his degree of improvement."